and Exchange Commission. Mr. Hungar for the Petitioner, Ms. Hardin for the Respondent. Good morning, Mr. Hungar. Thank you, Your Honor, and may it please the Court. The Commission is in an exogenous shock on the securities market that admittedly threatens to harm investors, reduce liquidity, and unfairly tilt the competitive playing field in a way that harms exchanges and benefits off-exchange dark venues, all without advancing any of the objectives of the Exchange Act. The Commission didn't even find that its new rule will do more good than harm, nor did it conclude that the information it hopes to obtain from this reckless experiment will actually benefit investors, strengthen the market, or promote the purposes of the Exchange Act. The Commission is acting like a doctor who subjects his patient to a risky open-heart surgery without first using all of the available diagnostic tools to find out whether there's anything wrong and without knowing whether any good will come of the risky experiment. The rule is unlawful and should be vacated. Section 11AA of the Exchange Act requires the Commission to exercise its rulemaking authority in a manner that carries out the objectives specified by Congress. Even the Commission concedes at page 29 of its brief that it must explain how its rule furthers Congress's objectives. And yet, nowhere in its adopting release did the Commission even purport to find that its new rule will protect investors, achieve fair and orderly markets, or promote efficiency, competition, or any of the objectives stated by Congress in Section 11A. Well, the purpose of it is to get data. Are you saying that's an impermissible purpose under the APA? I mean, they can't, they're frank in acknowledging they can't give you what you're crying for, which is a perfect prediction, because they're trying to get information to make a perfect prediction. It's a time-limited rule. And the question is whether under the APA, where it's not forbidden by the statute, whether an agency has authority to engage in this kind of an investigation to be able to secure the data they need to achieve the ends of the statute. That's what they're intending to do. So I'm not sure I'm understanding. Are you saying that is absolutely forbidden under the APA, or what? If an agency is able, in keeping with the statutory prerequisites for rulemaking, to further, that it predicts, reasonably based on the record, will further the purposes of the Act? Well, the prediction is we'll get data that will allow us to make informed judgments. That's the prediction. But, Your Honor— And that's what this really comes down to. Is that permissible or not? It's not permissible if the agency can't comply with the requirements of the Act necessary before it imposes— I also would be in your position that using the words exploratory or pilot, it does not give an agency a free pass to get out of APA free, as one of my colleagues wrote in a different context. That's absolutely right, Your Honor. They still have the same requirements for rulemaking, even if the rule is totally exploratory. Exactly right. Because the Exchange Act doesn't give the Commission a free pass to evade the requirements of the statute, just because it's an experiment. When you're looking at the cases that are cited by the agency, your position would be—the question is not whether it's forbidden by the APA, but whether it is presently permitted by the APA to depart from the usual requirements of rulemaking in order to do an exploratory, right? Precisely, Your Honor. In some agencies, there are statutes, like the one that's coming up in the next case, where the statute explicitly gives the right to make a pilot or exploratory program while they FERC and the FCC in prior cases, so that we might assume that when Congress doesn't give that authority, they don't have that authority, right? Exactly right, Your Honor. Is that your position? Absent explicit authority, a pilot program is forbidden? No, Your Honor. No, Your Honor.  What's your point? The Exchange Act authorizes the Commission to issue rules if it complies with various stated requirements, such as it must find that the rule in this context under Section 11A, as the Commission concedes, will carry out the objectives stated by Congress in 11A, protect investors, enhance market efficiency, provide fair competition, the various objectives stated— If it's trying to get data to better do all of those things, that's impermissible? It's not impermissible necessarily. It's permissible if the agency could say, for example, if the Commission had been able to say, and the record supported it and it provided a reasonable explanation that said, we think that proceeding down this road of changing the regulatory requirements that we previously imposed in this manner is, we predict, it's more likely than not to provide the following benefits that Congress has articulated in the statute that we're supposed to affirm. They said, we think it's more likely than not that we will get data that will allow us to do precisely what the statute requires us to do. That's what they're saying. With respect, Your Honor, they didn't say that. If they had said that, we would be having a different conversation. But what they actually said at page 77 of the joint appendix is that we cannot predict whether the results of the rule will suggest any particular policy direction, and the results could suggest that existing approaches may be more beneficial to investors. That's exactly right. They're trying to determine whether or not the status quo is where they ought to be. And how do you do that without data? And using your medical examination, sometimes you do exploratory surgery and the patient knows the best we can do right now is exploratory surgery because we're not precisely sure. And so we need to take a look. And if it were not time limited, I could understand your argument better. I'm just trying to figure out where you give them any room at all to try and get the information they need to meet the statutory requirements. If the Commission had said, we predict, and if the record supported this prediction, that benefits A, B, and C, I mean, that objectives A, B, and C articulated by Congress in the statute are likely to be furthered as a result of this program, we would be having a very different conversation. They did not say that. It's interesting, Mr. Hunger, because in a way, you're faulting them for their neutrality. And it's true that when we're doing research, we typically have a hypothesis. And I would say, reading the record, that the Commission's hypothesis is that the maker-taker system is not good for the markets and for investors. But instead of saying, we're going to tell you, put our finger on the scale in support of that evidence, they're saying, look, we're not going to prejudge this. It's possible, and I guess the tick pricing, they did a pilot and they thought, well, maybe not. It's possible that this will put to rest the concerns we have. It's possible that it will substantiate those concerns. So it almost feels like you're pushing them off of neutrality. And I'm just not sure why that would make them more in compliance with their statutory obligation. Well, a couple of responses. I don't think they have stated the hypothesis that Your Honor suggested. They clearly say, we don't know whether there's a problem. The reason this is coming up is because there's a lot of research and a lot of clamoring that's concerned that these markets are, you know, causing, disadvantaging certain clients that shouldn't be suffering. There's a lot of clamoring. The Commission was unpersuaded by the research and questioned its accuracy or its probative value because of limitations on the studies that have actually been done. But first of all, as I said, the fact that the Commission thinks there's a question doesn't allow it to issue rules that threaten to harm the very markets that they're supposed to protect. They clearly say that at the point at which a rulemaking is made, neutrality is not a virtue. The APA contemplates that the Commission will have its mind made up when it makes a rule and imposes regulation on an industry, rather than that it's still neutral. And here they're imposing the obligations of a rule when they don't know whether it's good or bad, right? That's right. At the very least, the agency has to be able to predict, with support in the record and reasoned decision making, that what it's doing is going to do more good than harm. It can't predict that here. That overstates the APA. There really are lots of cases where we do not impose an absolute requirement of, you must predict, X will happen. Agencies have to have more room than that. They cannot always predict with certainty that a certain result will follow. That is not the APA. I agree, Your Honor. I'm not saying they have to predict with certainty, but they have to at least think that it's more likely than not to do good. But it's curious because, as you know, given the clients you represent, one of the very important interests that the Commission protects is confidence in the exchanges. And if there is substantial research, even if the Commission questions it, it seems like it is in the interests of all the different stakeholders here to clear the air. You know, maybe they'll have a study and they'll say, look, we really looked into this. We did the best design. And guess what? Maker-taker is not a problem. And that would be a benefit to all of the stakeholders. No? I mean, if that's really the position that they're in, they can't do that? They can't satisfy the public? Two responses. First of all, I think the answer is no, they can't, if they can't predict any good is going to come and if they admit... If the good is answering the question. If the good is not... And so coming into it with an open mind and saying, we hear you, we hear you, we're going to do something that we think is neutral, we're going to come up with data on which we're going to make the substantive decision, is having a hypothesis of how that relates to the public good. No? Answering an abstract question that doesn't actually improve any of the... achieve any of the objectives of the Act is not permissible. But I have a second answer, if I may get to it, which is, even if that were true, and we don't at all concede that it is, that they can impose regulatory burdens and threaten the market without explaining how some good is going to come of it, even if they could do that, at the very least, they would need to have exhausted all the non-harmful methods, all the methods that don't threaten investors, and they admit they haven't done it. For instance, with respect to the competitive harms that they threaten to impose, they said, well, we couldn't assess those. Why couldn't we assess them? Because we don't have information. Such as, we lack data on the current pricing schedules offered by off-exchange venues. We lack data on routing decisions of broker-dealers. We lack data on how difficult it is for off-exchange trading venues to adjust their pricing schedules. This is at page 100. They also, with respect to broker-dealer competition, they lack sufficient data on the differences on commission rates between large and small broker-dealers. That's at page 105. Similarly, with respect to conflict of interest by brokers, pages 70 and 71, and ATSs, they lack information on routing, ATS routing tables, and so forth. And also page 107 of the Joint Appendix with respect to capital formation. All these things, they lack data. The Commission has comprehensive authority, under section 17B of the Exchange Act and its regulations, to demand that information from brokers at their whim. All they have to do is say to the regulated entities, the ATSs and the broker-dealers, give us your routing tables, tell us what you're doing, show us how you decide where to send orders, and we will then know, are you acting on the basis of conflict of interest to the detriment of your customers, or are you instead doing what you're supposed to do, which is acting for their benefit? The Commission refused to ask for that information, and instead they want to impose these threatened harms on investors. The tick size pilot alone, according to the Albuquerque study, which the Commission refused to credit without any basis, the Albuquerque study found $6 billion in investment losses from the tick size pilot alone, and the order of magnitude of this impact on the market is at least 10 times as great. You would say that the Commission is correct in its brief when it says that before making a rule, and I put those words in myself before making a rule, but I'm quoting their brief, the Commission must explain its conclusion that a rule further Congress is objecting and its reasons for believing that more good than harm will come of its action. And that applies even if they use the word exploratory or pilot or something else. It's still a rule, it still has to meet the rulemaking requirements. And if they're right about that, they're just ignoring their own policy and statutes when they start exploring. There's no experimental exception, and if there were, if this Court were to hold in this case that the Commission can get away with what it's doing here without having predicted that any of the stated statutory objectives will be furthered, you've driven a huge truck through the APA because it's always true that a new rule will provide more information about how that rule affects the regulated market. So if an agency can say, well we have no idea if it's actually going to further any of the objectives of the statute, that's what we want to find out. We're starting with the premise that there is an existing problem, which at least my reading indicates that's true. I'm talking about this context. I don't know about every agency. I'm talking about what I've read in this case and about this context. It is mostly agreed by all the players, even though there are people on both sides of it, that there are some serious issues that have to be addressed. Oh, you say there are no problems? It is not agreed that there are problems. I agree there's a dispute about that, but it's certainly not agreed. In fact, there's substantial evidence that the maker-taker... That's what I'm saying is that people agree there is a serious, a significant serious dispute over whether the market is working the way the statute intends for it to work. And that alone is bad for the market. That alone. And therefore, isn't it within the Commission's remit to do something that it believes will help to settle that question? I don't think that's a rationale stated by the Commission in this decision. I don't think they say, we're advancing protection of investors because uncertainty about whether this is a problem is causing harm to investors. I don't think that's their rationale, their stated reasons of analysis, but nowhere do they actually go through the statutory process of saying, well, yes, this objective of the Act is being furthered, this objective isn't. In fact, they admit all the objectives, all the stated objectives set forth in the statute. Protection of investors, they admit investors may be harmed by this. Efficient securities transactions, they admit efficiency may be harmed by this. Fair competition, they admit competition may be harmed by this. Capital formation being the only exception. With respect to capital formation, the most they can say is, well, we don't think it's going to be affected, which is arbitrary and capricious because it rests on the view that their theory, their academic theory, which has no support in the record, trumps empirical evidence to the contrary. But there is no finding with respect to any of the statutory objectives that any of them are going to be furthered by answering this question. And if there were, we would be having a different discussion. But you can't let an agency get away with saying, we have no idea whether any of our statutory objectives are going to be furthered, but we just want to find out. Is it your position that, in light of risk of harm, that the agency can never do an investigation or investigatory rule like this where there is some quantum of risk, of harm to some of the interests? Not at all, Your Honor. Where do we draw the line? How do we know how much risk is too much? Well, that's the agency's job, but the agency has to say, number one, what the agency has to say is, yes, there are risks, but on balance we think something, something good is going to come of this. They have to be willing to put themselves on the line to that extent to say, something we think, we can't be sure, we think something good is going to come of this. And in every one of the experimental cases that the agency relies on, that was true. The agency said, of course, we don't know, but we're going to go down this road. We think it's going to be better and the experiment will allow us to confirm that or learn that it's not true and then we'll make a further regulatory decision on the basis of that. But at least the agency was doing its job, making a prediction, saying, this is our best estimate of the likely outcome here. We think it's a benefit. If it proves not to be, based on the results of this experiment, we'll come up with a different approach. But the agency here was unwilling to say that. Thank you. Good morning, Your Honor. Tracy Harden on behalf of the Securities and Exchange Commission. At the outset, I want to make clear precisely what the Commission did conclude here. It concluded specifically in the release that engaging in this pilot to gather this necessary data would further the purposes of the Exchange Act. That's at page 57 of the appendix. It found at page 21 of the appendix that engaging this pilot would enable it to carry out Congress's objectives. Now, you say able to carry out Congress's objectives, but you're making a rule here. If you didn't have that word experiment in there or a pilot or a timeline or something, it still would be a rule that compels certain behaviors or forbids certain behaviors while it's in effect, right? That's correct, Your Honor. Does the Commission anywhere in the opinion give us the foundation we normally look for for the conclusion and the facts that support it that this rule that you've made or the Commission's made will do, as your brief says, more good than harm? Your Honor, what the Commission said with respect to each of the test groups here, with respect to the FECAP test group, the Commission specifically said that the information gathered would... I'm talking about the rule itself. I'm talking about the rule itself. Is there anything in there that says that this rule is going... In fact, it says we don't know whether the rule would do more harm than good, right? It said that it couldn't make an ultimate prediction as to whether the economic costs here would be incurred or whether there would, in fact, be temporary economic benefits. Now, could you possibly defend that rule if you didn't have the description of it as information gathering or experimental? If you just had the rule compelling making changes in behavior of the regulated entities, could you possibly defend that? I think that would certainly be a more difficult case, but that's precisely why the Commission is engaging in the pilot it's engaging in, and it found... The fact that this will give you information is not by itself an objective of the statute, right? It is not an objective of the statute, but... ...that we saw in State Farm or that we see in the next case this morning or other cases where we have upheld exploratory rules, you don't have that in the SEC statute, do you? A couple of points there, Your Honor. What we do have in the statute is a continuing regulatory responsibility to ensure that the national market system is operating efficiently. Every regulatory statute has something like that as a goal. But that doesn't mean, does it, that they have the goal to go out and explore? Not by itself, does it? Perhaps not in every case, Your Honor, but particularly here where the agency is faced with a credible case on both sides, both that the status quo is causing market distortions, which the Commission found that it believed on page... I'll get that cite in one minute, but on page 56, what it found was this pilot was necessary to determine if a regulatory response was needed for potential distortions. If that's your best shot, that there's evidence on both sides and we can't make up our minds, and you didn't have the words exploratory in there, not the word, but the concept in there, you couldn't base a rule on that, could you? You were saying, we can't make up our minds, we can't tell whether this will do more harm than good, we can't tell whether this will further the... We couldn't have told a rule like that, could we? I think that the Commission was well within its authority when it determined that answering this question is important in furtherance of the purposes of the Act. But they also concluded they couldn't answer the question yet. So isn't that rather conclusive that they shouldn't be making a rule yet if they can't answer that question yet? I think, Your Honor, that that puts the Commission in sort of a Catch-22 situation of we can't gather information that's needed to determine if there's active market distortion because we don't have the data. And it's that informational benefit that the Commission specifically said would further the public interest here. I suppose that you wanted to regulate before you put out the expiration to give the information to decide whether or not to regulate. I disagree with that. There's a different problem in the situation. I realize you're on the domestic side and that's foreign policy language, but there's a different problem in the situation. There isn't a regulatory need just because of the situation. There has to be a problem that's solvable. There was a regulatory need here, Your Honor, because of the fundamental questions as to whether the status quo is causing market distortions. Where's your baseline? Where's your best record citation to indicate that we are starting with a clear problem? We, the agency, say there is a problem in the market now that needs to be addressed. The other side says no, it's not there. The other side says two things. One, there is more information you could have gotten without a rule. And they say there isn't anything to indicate, at least as I understand them, any serious problem. Where is it? Because I think what Judge Santel is saying is correct. If you're not starting from a base of... We, the agency, say the market is not working ideally. There are problems, and it's our job to figure them out. So now we're going to have a rule to get the information. Where is that information? There are two places I would point, Your Honor, to you. First, at page 56 of the Joint Appendix. Second, at page 100. At page 56, the Commission found that this pilot was needed to determine if a regulatory response was necessary to potential distortions of the market from the status quo. Your Honor, where is it, if anywhere, that the agency says, yeah, there may be issues. Not that, but the agency says there are issues. And we need more information to be able to address the problems that we are looking at in the market. Where is it? I think probably the best indication of the Commission's feeling on that is page 100 of the Joint Appendix, where the Commission said, we believe there may be potential distortions because of maker-taker pricing, and we believe it is necessary to engage in a pilot to gather the data to determine if a regulatory response is needed. The Commission also, at page 66 of the Joint Appendix, specifically said, look, we understand that we could try to use theory here and make a prediction, but given the lack of empirical evidence in the record and the importance of these questions, the Commission reasonably found it was appropriate to go take these limited steps and gather the needed data so it could make a data-driven decision on these questions. I have three related questions for you, Ms. Harden. One is, I thought I heard you say, in response to a question from Judge Santel, that information gathering is not one of the objectives of the agency. Was I hearing you correctly? Well, it's not one of the listed objectives of Section 11k of the statute. Certainly, engaging in data-driven decision-making is something that is well within the purposes of 3F and the Exchange Act. That's something this Court itself has indicated the Commission should be striving to do. Have we ever upheld rulemaking based on the notion that data gathering is a sufficient goal to be accomplished by a rulemaker? There are certainly cases in which experimental rules have been upheld. Has there ever been one that was under the SEC statute or any other statute that didn't have the express grant of authority that was found in the postal and in the PER and the FCC and will be found in the next case after yours? Your Honor, I don't think any of that case law indicates that there needs to be a specific statutory grant of authority for limited rulemaking. What that case law says is that you can't go outside your otherwise conferred regulatory jurisdiction just because it's experimental. I was asking you if you have any case where we upheld a pilot or exploratory rulemaking where there was not an express grant of that authority. I think the FCC case we've cited in our Read the United Telegraph case is one such case. Was this not done by an NMS plan because the exchangers aren't buying in? I mean, the tick pricing rule was not done by a rule. It was done as an NMS plan. I'm just curious what the difference is. I think the difference is the regulatory scheme through which we ordinarily regulate transaction fees is done. The existing fee cap, for example, Regulation 610C was done by rulemaking under NMS. One of the things the Commission is exploring here is whether that cap continues to be appropriate or whether it's allowing fees to be held artificially high to subsidize rebates. Some of the questions I was asking of Mr. Hungar may or may not have a basis in the record, as you see it. Is market confidence one of the rationales that you're relying on here to answer this question one way or another, or not? The Commission didn't actually expressly invoke market confidence, but what the Commission said is the information gathered here will benefit investors and the public interest. That's at page 36 of the appendix. The Commission also found that the information gathered through the no rebate test group at page 38 justified proceeding on that basis. Again, this is all against the backdrop of the Commission's continuing responsibility to ensure among changing market conditions that the regulatory scheme continues to further Congress's objectives for the national market system. What about the data that the other slide says you could have collected without adopting this rule and you haven't done it? The Commission specifically went through existing data sources on this question, and ultimately none of the data that the Commission looked at or that the petitioners are referring to this morning would get you to the question of causality. Will this test get you there? Yes, Your Honor. What the Commission found is that this test is reasonably designed to get us there because the real causation issue here is that fees and rebates and order routing can be jointly determined, and so if you don't hold one constant, you're not really going to know what the causal factor is, and that's what the pilot does. But does the pilot hold a constant? One of the things, I think it's in the market maker's brief, they talk about the inability to distinguish client versus proprietary orders, and that you will also be unable to distinguish that with the data that you're collecting. Is that a problem or not? We disagree with that, Your Honor, and I think there's really two points to be made there. First of all, the principal agency distinction for orders only gets to the question of potential conflicts of interest for broker-dealers, so it doesn't speak to any of the other market structure questions the Commission's looking at. And also, with respect to that, what the Commission made the determination was that marking them principal or agency will get us enough of a distinction to get some meaningful research, but the reason the Commission didn't go further is it was trying to tailor this pilot to limit its impact, and what it didn't want was to start requiring collection of additional data and recording of data that exchanges aren't already doing now, and so we decided this would be an appropriate proxy for that question. There are markets out there that don't use maker-taker. Why are those not already the source of the data that you need? Compare a maker-taker market or maker-taker exchange with one that doesn't use the rule. For precisely the question we were getting at earlier, Judge Piller, which is that you're not going to be able to determine causation, again, without holding one constant, and as long as you have rebates being paid at other exchanges, that's not going to tell you what happens if no exchange does it, right? It's not going to tell you the effect on spreads, for example, across different classes of securities if rebate-sensitive orders can just go next door to the other NYSE-sponsored exchange, which does pay rebates. It's not going to tell you the effect of lower take fees market-wide on order routing. So many of these execution-quality questions are not going to be answered so long as you have most exchanges paying rebates, either maker-taker or taker-maker. And so that is, again, a piece of why the Commission decided and reasonably determined that in this situation it was necessary to take these limited steps to gather data so that it could make an informed decision on the effect of these. Your research didn't produce anything really much on point, I gather. I mean, I'm really kind of surprised when I started looking at this, the pilot program-type question of the APA. We've had thousands of APA cases over the years, and you really couldn't come up with much which endorses the idea that an agency perplexed about some things in the area in which they're regulating can say, well, let's try this. And the courts have said, sure, go ahead. It's your area to regulate. Go ahead and try it. See what you come up with. Make it time-limited so it seems fair. But the cases aren't there. And for the obvious reason, because there are adverse consequences that flow from that approach, and if you're saying nothing more than, there may be some stuff there, let's look at it. If you had a really strong position where the agency here is saying, there is a real problem. We know there's a real problem. We have to get at it. And there's not much disagreement over that. Market confidence is affected. The market is not working the way it ought to work. We need the information. But you're not even saying that. You're just saying, well, you know, we could probably do it better if we had more information. So now we're going to wreak havoc by putting a regulation in effect which will cost folks some money. I think it's it ignores sort of the larger context of this rule. You found no cases, right? I think the FCC United Telegraph case is probably the best one that we found, Your Honor. Yes. That's a whole lot of cases out there, and that's all you could come up with. I mean, there's also, you know, a number of FERC and Federal Power Commission cases which there's nothing to indicate in the reasoning of those cases that they are limited to the idea of rate making. But that being said, you know, this isn't an unusual question before the court in the sense that this is clearly governed by State Farm standards. Is this a reasonable or rational exercise of the Commission's authority? Not only was there express authority for the agency to use the expiration. They were directed to, weren't they? That's one that is a very specific direction that you will issue a rulemaking within X period. That may mean in a minute, but you will issue a rulemaking. I noticed a proposed rulemaking. It will do certain things, and they were, the agency was definitely empowered to do experiments in that statute, wasn't it? But again, I don't think there's anything in the case law that turns upon the idea of a specific statutory provision for experimentation. The question is An agency has only the authorities they're given by statute. It's not a constitutional creature. It doesn't have inherent authority. So the fact that there aren't any cases saying that the statutes allowed it is evidence against you, isn't it? Not here, Your Honor, where we have explicit statutory authority to regulate transaction fees and to carry out the objectives of the NMS. And the question is, is the decision to do so in a limited manner to gather information a rational exercise of that authority? Whether that decision still requires the same foundation as rulemaking would in other countries. We are not contesting that the rulemaking. The APA is what I'm asking about. You seem to be trying to get out of the APA to have a get-out-of-APA-free card by calling it time-limited or by calling it pilot. Nonetheless, it's a rule that affects primary conduct with the regulated entities. I don't think that's our position, Your Honor. We certainly accept that the APA requirements apply here. We simply disagree as to whether we've met them. And we believe in this context where this is not, as Judge Edwards referred to, sort of the mere idle curiosity. This is the result of a long-standing and well-thought-out deliberative process. You've had market participants and academics proposing and debating alterations to this regulatory structure for years. We've had members of Congress and two commission advisory committees recommend doing a pilot on the basis that there's not another way to answer these very important questions of market structure and where both the status quo and the suggested alternatives are credibly claimed to cause actual market harm. It's certainly a rational exercise of the Commission's authority to take limited steps and gather data. And to the extent that we think it's relevant that this is limited is that we think that's relevant to the State Farm Inquiry. I'll have to go back and look at page 100. That's the only page you're citing. You're saying the Commission says there really is an existing problem? It's a very serious one and it's undisputed. Is that your claim? Your Honor, to be clear, what the Commission said is we believe there may be, given the evidence before us, active distortion going on in the market, and we need to determine whether that is the case. And that is the impetus for this rule. So you're referring to the Commission believes the current fee and rebate system may have resulted in a number of market failures, including rebates incentivizing brokers to route orders to trading venues that pay the highest rebates. Is that the part you're referring to? That is, Your Honor. However, the Commission currently lacks the data to estimate the extent of any existing market failures. And so the information that learned from the pilot could be used in future rulemaking. Yes, and the Commission said something similar to that, although not those exact words, at page 56 of the appendix in discussing the authority to engage in the pilot. Does page 100, I'm not looking at that language, does page 100 say there are market failures because of this, or we think there might be? We think there might be. But again, the reason we couldn't say there are is because we don't have any data, empirical data, on the causality here. And what the Commission said it's trying to do is to make a data-driven decision when it's addressing these very important questions of market structure. And that is consistent with both the statutory authority and this Court's case law. And can you address some, I mean, there are several steps to the challenge, and one of them is even if you were authorized and had checked the boxes that you need to do this pilot, that the way it's designed, you aren't going to get the data that you want. And I don't know if you want to respond to any of those claims. I do, Your Honor. Yes, I mean, I think the biggest claim in that regard is about the inclusion of off-exchange venues. Exclusion. Exclusion. Yes, I'm sorry. And what the Commission said about that is existing data is going to allow it to track order flow on and off-exchange, which is sort of the important question for purposes of this pilot with respect to off-exchange venues. And the reason that's really the important question is otherwise off-exchange venues are not at all part of the regulatory scheme that's being tested here, nor do they charge transaction-based fees, for example. They typically don't pay rebates. And so none of the other questions the Commission is asking in terms of what's the appropriate regulatory structure for exchange transaction-based fees really apply off-exchange. The only sort of the most pertinent question with respect to those is does the regulatory scheme on-exchange shift order flow back or forth off-exchange? And we can track that with existing data. And so the Commission found both that it wasn't necessary to include off-exchange venues for that reason, but also that to do so would involve a greatly increased scope and complexity and cost to this pilot. If you think about it, the Commission essentially would have had to create a regulatory scheme to overlay over off-exchange venues whose fees are not regulated right now at all in order to include them for a short pilot. And given that we didn't need the more granular data for them, it was a reasonable conclusion despite the potential for competitive burdens to go forward on that basis. Thank you. Thank you. There's no time remaining. Mr. Hunger will give you two minutes of rebuttal time. Briefly, with respect to the question whether the Commission found a problem, it clearly did not. The pages cited by counsel do not say the Commission believes there is a problem. It says there may be, there may not be. We don't know. That's not the finding of a problem. And the information that the Commission refused to obtain would clearly and unquestionably have shed light on that question. The biggest element of the question, is there a problem, is there a problem, are broker-dealers behaving in ways that reflect a conflict of interest that are contrary to the interests of their investors? Clearly, if you ask for the routing tables, you could answer that question. The SEC doesn't deny that the routing tables would not shed light on the question whether broker-dealers are behaving in the way that they should. They refused to answer the question. In fact, they conceded on page 71 with respect to ATSs, which are also regulated as broker-dealers, that, well, yes, we're going to be getting information from them, but it won't contain routing tables, so it won't contain detailed information on how fees and rebates affect the order routing decisions. These limitations make it difficult to use the data to make causal inferences. Of course, those limitations are the result of the Commission's own refusal to demand the information that it has every right to obtain to help answer the question, is there a problem that would then maybe justify going down the road of imposing these harms on investors? The Council cited the United Telegraph Workers case as authority for the proposition that an agency can use experimentation as a justification for not advancing the purposes of the statute it's charged with implementing. The case says nothing of the kind. To the contrary, this Court said that the Commission, the FCC in that case, has a mandate under the statute to inform itself of technical advancements and improvements in modes of communication so that the benefits of new inventions and developments may be made available to the people. And this experiment was designed, this is United Telegraph Workers against FCC and the Court said this experiment that was being challenged was designed to make such innovation possible. So the Commission said and was furthering the purposes of the statute. This Commission is not doing that. Thank you. Thank you. Case is submitted. Stand please. This is all for portable milking and brief recess.
judges: Pillard, Edwards, Sentelle